**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TERESA MESSINA, NICHOLAS KUKUC, and A. M., a minor child, by and through Teresa Messina, his Mother and Next Friend, | ) ) ) ) ) | |
| | ) | Case No. 1:14-cv-7099 |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| | ) | Hon. Joan Humphrey Lefkow |
| GREEN TREE SERVICING, LLC, a Delaware Limited Liability Company, | ) ) ) | **PLAINTIFFS' OPPOSITION TO** |
| | ) | **MOTION FOR SUMMARY** |
| *Defendant.* | ) | **JUDGMENT** |

## I.    BACKGROUND

Green Tree placed approximately 300 telephone calls to Teresa Messina, and her two sons

(including while they were in school), in an attempt to collect a disputed $420.54 debt.[1]  On

numerous occasions Ms. Messina told Green Tree that she felt they were being harassed, and to stop

calling, including on July 19, August 29, and November 19, 2013. (Plaintiffs' Statement of Additional

Material Facts ("PSAMF") at ¶ 5.) As did her children. (Kukuc, PSAMF at ¶ 11; A.M., PSAMF at ¶

13.) According to Green Tree's own records, Green Tree placed 265 calls to the Plaintiffs from

April 29, 2013 to August 2014. (PSAMF at ¶ 1.) Green Tree placed 203 of those calls in

approximately 2 months, from September 12 to November 15, 2013.[2] Of the 265 calls Green Tree

admits to, at least 96 were placed to Ms. Messina's children's cell phones, including at least 56 calls

---

[1] For the convenience of the Court, Plaintiffs' counsel has created a summary chart citing to Green Tree's evidence (reflecting 265 calls to Plaintiffs), and another combining Plaintiffs' evidence with Green Tree's (reflecting 323 calls to Plaintiffs). Jordan M. Sartell's Declaration in Opposition to Motion for Summary Judgment ("Sartell Dec.") at ¶¶ 3-8, **Exhibits 1 and 2**.  Such documents are admissible as a demonstrative exhibit, or summary pursuant to F.R.E. 1006. *Todd v. Daewon Am.*, 2013 WL 557859 (M.D. Ala. Feb. 13, 2013); *Westfahl v. District of Columbia*, 75 F. Supp. 3d 365 (D. D.C. 2014).

[2] Sartell Dec. at ¶ 11.

to 14-year-old A.M. (PSAMF at ¶ 2.)[3] Green Tree placed as many as 30 calls on a single day, namely October 11, 2013, and on numerous occasions would place more than 10 calls per day. (PSAMF at ¶ 3.) Green Tree also hung up numerous times without meaningfully identifying itself or leaving any message. (PSAMF at ¶ 4.) Green Tree intruded upon Plaintiffs' seclusion and placed robocalls to Plaintiffs' cellular phones with an automatic telephone dialing system without consent.

Green Tree has a business plan and practice of unlawful collection practices, including repeated and intrusive telephone calls, failing to cease calling after being requested, impermissible calls to third parties, etc.[4] The Federal Trade Commission has described the facts alleged in its recent lawsuit against Green Tree (resulting in a $63 million settlement) as:

> Green Tree's collectors often unleashed a barrage of phone calls, some starting as early as 5 in the morning or continuing until as late as 11PM. The collectors didn't limit themselves to home phones, getting some people in trouble by calling them at work…Green Tree's loose-lipped collectors were known to discuss people's debts with bosses, co-workers, neighbors, and family… And in numerous cases, Green Tree pressured people to use a method called Speedpay, which the company falsely claimed or implied was the only way to make a payment or the sole choice to avoid a late fee. Using Speedpay cost a $12 "convenience" fee per transaction.[5]

## II.  <u>INTRODUCTION</u>

Defendant's MSJ must be denied.  First, according to the Restatement (Second) of Torts, "There is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are

---

[3] Plaintiffs contend that there were many more calls than those reflected on Green Tree's records. Sartell Dec., **Exhibit 1**. Plaintiffs relied on notes created from their cell phones' caller ID information to supplement information available in Green Tree's records. *See* Sartell Dec. at ¶ 6; *People v. Caffey*, 205 Ill. 2d 52, 792 N.E.2d 1163, 1191 (2001) (called ID information is not hearsay if the caller ID device is proven reliable.).

[4] See numerous similar consumer complaints at: *Modica v. Green Tree Servicing, LLC*, No. 1:14-cv-03308 (N.D. Ill.); *Brencis v. Green Tree Servicing, LLC*, No. 1:14-cv-02079 (N.D. Ill.); *Robinson v. Green Tree Servicing, Inc.*, 13 CV 6717 (N.D. IL); *Castro v. Green Tree Servicing, LLC*, No. 10-cv-7211 (ER) (PED) (S.D. NY); *Massey v. Green Tree Servicing, LLC*, 09-cv-01117 (W.D. WV 2009); *Obarr v. Green Tree Servicing, LLC*, 09-cv-09496-DDP-O (C.D. Cal. 2009).

[5] https://www.ftc.gov/news-events/blogs/business-blog/2015/04/will-63-million-ftc-cfpb-settlement-encourage-green-tree

repeated with such persistence and frequency as to amount to a course of hounding . . . that his privacy is invaded."[6]  Second, it is the burden of the debt collector to show it had a consumer's prior consent to place telephone calls to the consumer's cell phone using an automated telephone dialing system ("autodialer"), and Ms. Messina revoked any consent on numerous occasions. Third, Green Tree is a debt collector since it acquired the debt after it was in default; and treated the debt as if it were in default. Fourth, since Green Tree's practices, in violation of the FDCPA, TCPA, and public policy, are also unfair, oppressive, unscrupulous and unethical, causing substantial injury, it also violated the Illinois Consumer Fraud Act, and Fifth, it is a fact question whether Plaintiff's letter satisfied the Real Estate Settlement Procedures Act ("RESPA") requirements.

Congress enacted the Fair Debt Collection Practices Act ("FDCPA") because it found: "There is abundant evidence of the use of abusive, deceptive, and unfair debt   collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to **invasions of individual privacy."** 15 U.S.C. §1692(a).  Similarly, the Telephone Consumer Protection Act ("TCPA") recognizes how highly offensive and outrageous repeated and continuous calls are, and prohibits such conduct, regardless of whether conversation ensues.[7] The Third Circuit recently stated, "Congress passed the TCPA to protect individual consumers from receiving **intrusive** and unwanted calls."[8]  In doing so the Third Circuit cited a U.S. Supreme Court FDCPA cases that discussed how automated dialer calls were an invasion of privacy.[9]

---

[6] As cited in *Bauer v. Ford Motor Company*, 149 F. Supp. 2d 1106, 1109 (D. Minn. 2001), and *Corson v. Accounts Receivable Mgmt.,* 2013 WL 4047577 (D. N.J. Aug. 9, 2013).
[7] *Fillichio v. M.R.S. Associates, Inc.,* 2010 WL 4261442 (S.D. FL 2010) (the TCPA does not require the calls to be answered for there to be a violation). *See Meadows v. Franklin Collection Service*, 414 Fed. Appx. 230 (11th Cir. 2011)("The statute itself recognizes that answering the phone is not necessary for there to be harassment.").
[8] *Gager v. Dell Financial Services, LLC*, 772 F.3d 265 (3rd Cir. 2013).
[9] *Gager*, citing *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 744 (2012).

## III. <u>LEGAL DISCUSSION</u>

### A. Green Tree Intruded Upon Plaintiffs' Seclusion

- The Northern District of Illinois has stated that repeated and unwanted telephone calls can constitute intrusion upon seclusion.[10]

- According to the Restatement (Second) of Torts, "There is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding . . . that his privacy is invaded."[11]

- "Other states have recognized the intrusion tort and its application where unwanted and repeated telephone calls form the basis for imposition of liability."[12]

Simply put, the FDCPA preserves the "right to be let alone," famously classified by U.S. Supreme Court Justice Louis Brandeis as "the most comprehensive of rights and the right most valued by civilized men" and has noted that "preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value."[13] Indeed, individuals have a legitimate expectation of privacy in their homes, office or elsewhere, arising from the right to be left alone.[14] The Seventh Circuit has explained the difference between secrecy and seclusion:

---

[10] *Fisher v. Quality Hyundai, Inc.,* 2002 WL 47968 (N.D. IL Jan. 8, 2002). Citing *Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993).

[11] As cited in *Bauer v. Ford Motor Company*, 149 F. Supp. 2d 1106, 1109 (D. Minn. 2001), and *Corson v. Accounts Receivable Mgmt.*, 2013 WL 4047577 (D. N.J. Aug. 9, 2013).

[12] *Otterbacher v. Northwestern Univ.*, 838 F. Supp. 1256 (N.D. IL 1993). Citing "*Harms v. Miami Daily News, Inc.*, 127 So. 2d 715, 716-17 (Fla. App. 1961); W. PROSSER & W. KEETON, TORTS § 117, at 854-55 (5th ed. 1984); see also *Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) (noting application of intrusion tort to unwanted and repeated telephone calls); *Lovgren [v. Citizens First National Bank of Princeton*], 534 N.E.2d [987,] at 989 [20] (same) [IL Sup. Ct. 1989]." Also *see Panahiasl v. Gurney*, 2007 WL 738642 (N.D. Cal. 2007), citing *Joseph v. J.J. Mc Intyre, L.L.C.*, 281 F. Supp, 1156, 1169 (N.D. Cal. 2003).

[13] *Carey v. Brown,* 447 U.S. 455, 471(1980).

[14] *U.S. v. Cortina* , 630 F.2d 1207 (7th Cir. 1980); *Biondich v. NBC Subsidiary (WMAQ-TV), Inc.*, 405 Ill. App. 3d 1186 (1st Dist. 2011) ("It is not unreasonable to expect privacy, that is, to expect to be left alone, in one's home"); *Benitez v. KFC Nat'l Mgmt Co.*, 305 Ill. App. 3d 1027, 1033 (2d Dist. 1999) ("Examples of actionable intrusion upon seclusion would include invading someone's home, illegally

"Privacy" is a word with many connotations. The two principal meanings are secrecy and seclusion, each of which has multiple shadings. A person who wants to conceal a criminal conviction, bankruptcy, or love affair from friends or business relations asserts a claim to privacy in the sense of secrecy. A person who wants to stop solicitors from ringing his doorbell and peddling vacuum cleaners at 9 p.m. asserts a claim to privacy in the sense of seclusion.[15]

The Seventh Circuit has recognized the tort of intrusion upon seclusion.[16] In 2012 the Illinois Supreme Court recognized the tort of intrusion upon seclusion and defined it as: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another **_or_** his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."[17] The sentence is clearly disjunctive. Furthermore, "Improper conduct in knowingly and intentionally pursuing a person to force payment of a debt, whether or not he owes it, may, under certain circumstances, give rise to a right to damages for an invasion of privacy."[18]

Not surprisingly, the Northern District has stated that repeated and unwanted telephone calls can constitute intrusion upon seclusion.[19] Courts have found debt collectors liable for intrusion upon seclusion for repeated telephone calls.[20] And, numerous courts have denied debt collector's efforts to dismiss or summarily adjudicate intrusion upon seclusion claims based on repeated

---

searching someone's shopping bag in a store, eavesdropping by wiretapping, peering into the windows of a private home, or making persistent and unwanted telephone calls."); *Ramsour v. JP Morgan Chase Bank*, 2012 WL 6004230, *7 (S.D. Cal. 2012) (right to be free from unwanted collection calls at home); *Kuhn v. Account Control Technology*, 865 F. Supp. 1443, 1449 (D. Nev. 1997) (right to be free from unwanted collection calls at work).[14]

[15] *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 2015 WL 2088865 (C.D. Cal. Apr. 17, 2015), citing *Am. States Ins. Co. v. Capital Associates of Jackson Cnty., Inc.*, 392 F.3d 939, 942 (7th Cir. 2004) (internal citation omitted).

[16] *Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993).

[17] (Emphasis added). *Lawlor v. N. Am.Corp, of Ill.*, 83 N.E. 2d 414 (2012), citing Restatement (Second) of Torts, § 652B.

[18] *Panahiasl v. Gurney*, 2007 WL 738642 (N.D. Cal. 2007); *Bauer v. Ford Motor Credit Co.*, 149 F. Supp. 2d 1106 (D. Minn. 2001).

[19] *Fisher v. Quality Hyundai, Inc.*, 2002 WL 47968 (N.D. IL Jan. 8, 2002). Citing *Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993).

[20] *Panahiasl v. Gurney*, 2007 WL 738642 (N.D. CA 2007).

telephone calls.[21] In citing the Restatement Second of Torts one court reversed an earlier ruling and determined it was a question for the jury whether a debt collector's intruded upon one's seclusion, although it was disputed whether there were 10 or more repeated telephone calls to a consumer and third parties (neighbors) over the course of a 5 month period.[22] Quoting from the Restatement Second of Torts the court states: "It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded." As yet another court reasoned:

> As previously discussed, the number of telephone calls made by Defendant to Plaintiff in the present action totaled 101. As such, there is, at the least, a genuine issue as to whether Defendant's communications are of the type to qualify as being a clear demonstration of the intent of Defendant to "abuse or harass" Plaintiff, as opposed to a "minor irritation and intrusion," thereby evidencing the tort of invasion of privacy by intrusion…[23]

Also relying on the Restatement Second of Torts, another court denied summary judgment to a debt collector regarding its repeated cell phone calls, stating:

> Technology and advances in science now allow individuals to make and receive calls on-the-go and in places in which the conventional land-line telephone would not permit. Defendant has cited no authority for the proposition that the Plaintiffs' receipt of its telephone calls while they were in their car, and outside their homes, should chip away at this long established "right to be let alone" in their private affairs.[24]

Another Court relying on the Restatement Second denied summary judgment on intrusion and

---

[21] *See Duncan v. JP Morgan Chase Bank, N.A.*, 2011 WL 5359698 (S.D. W. Va. Nov. 4, 2011) (fact issue whether numerous calls after request to cease were highly offensive; giving phone number to creditor not blanket permission to call; denying MSJ for 68 calls); *Fausto v. Credigy Servs. Corp.*, 598 F. Supp. 2d 1049 (N.D. Cal. 2009) (MSJ denied regarding intrusion claim, where debt collector made more than 90 calls to consumer, and consumer alleged harassment); *Joseph v. J.J. Mc Intyre, L.L.C.*, 281 F. Supp, 1156, 1169 (N.D. Cal. 2003) (triable issues of fact as to intrusion upon seclusion and a plaintiff's privacy was invaded by a debt collector, where the debt collector made two-hundred (200) repeated calls over a nineteen (19) month period); *Gray v. Chase Bank, N.A.,* 2011 WL 4716232 (S.D. W. Va. Oct. 7, 2011) (fact issue whether 594 calls, only four of which resulted in conversation, were highly offensive; giving phone number to creditor does not waive right to privacy).

[22] *Bauer v. Ford Motor Company*, 149 F. Supp. 2d 1106, 1109 (D. Minn. 2001);

[23] *Brandt v. I.C. System, Inc.*, 2010 WL 582051 (M.D. FL February 19, 2010), citing *Sparks v. Phillips & Cohen Assoc., Ltd.*, 641 F. Supp. 2d 1234, 1253 (S.D. Ala. June 20, 2008).

[24] *Duncan v. JP Morgan Chase Bank, N.A.*, 2011 WL 5359698 (S.D. W. Va. Nov. 4, 2011)

rejected the debt collector's argument that it was not liable because the consumer admitted the debt collector was polite on the phone and did not make any threats, and pointed to the 22 phone calls made by the debt collector in 3 months, despite there being only one single phone conversation.[25] In fact, a claim of intrusion upon seclusion can be based on just one phone call.[26]

As the Seventh Circuit said, "The tort of intruding upon the seclusion of another is aimed at discomfort caused by the intrusion itself-- for example, someone enters your bedroom, opens your mail, or makes repeated and unwanted telephone calls to you."[27] Placed in the context of the herein case, Plaintiffs had a reasonable expectation of privacy, from receiving phone calls at home, school or on their cell phones, that arises from a desire to be left alone. Any infringement of those rights may be found by the trier of fact to be highly offensive and an intrusion upon seclusion.

Additionally, courts have pointed to violations of the FDCPA, prohibiting repeated telephone calls, and failing to meaningfully identify oneself, to hold that the debt collector could also be liable for an intrusion upon seclusion.[28] If 54 calls in 6 months, including 17 calls in one month and calls to the plaintiff's school, in an attempt to collect a debt that was actually owed, are abusive and harassing as a matter of law,[29] then how much more so are 203 calls in 2 months? (*See* PSAMF at ¶ 1.) If 6 calls in one day are enough to deny a debt collector summary judgment on an intrusion upon seclusion claim,[30] then how much more so would 12 calls to Nick Kukuc be herein?; or a call to 14 year-old A.M. while he is in school?, to be followed by more calls after A.M. screamed, "**Get my number out of your phone. I'm in school!**" (PSAMF at ¶ 13.) At the very least, it is a jury question.

---

[25] *Desmond v. Phillips & Cohen Associates, Ltd.*, 724 F. Supp. 2d 562 (W.D. PA 2010).
[26] *Diaz v. D.L. Recovery Corp.* 486 F. Supp. 2d 474 (E.D. PA 2007).
[27] *Thomas, at 452.* (internal citations omitted).
[28] *Fausto v. Credigy,* 598 F. Supp. 2d 1049 (N.D. Cal. 2009).
[29] *Sanchez v. Client Services, Inc.,* 520 F. Supp. 2d 1149 (N.D. Cal. 1998).
[30] *Kuhn v. Account Control Technology, Inc.*, 865 F. Supp. 1443 (D. Nev. 1994).

Green Tree's reliance on cases where there was only one phone call is not helpful to the court here.[31] Nor are the several other cases it relies on that have nothing to do with repeated unwanted telephone calls to a consumer and her children.[32] In one mere sentence Green Tree argues that intrusion must be not only offensive, but *highly* offensive to a reasonable person. Docket# 95, MSJ, page 17. It as at least a fact question[33] whether Green Tree's onslaught of:

1) more than 300 telephone calls (or even 265 if the Court simply considers solely Green Tree's evidence) (PSAMF at ¶ 1),

2) which included at least 203 calls to the Plaintiffs in a 2-month period from September 12 to November 15, 2013, after Teresa Messina said she felt she was being harassed, and to stop calling (PSAMF at ¶ 2),

3) of which at least 96 calls were placed to her children's cell phones (at times while they were in school), including at least 56 calls to A.M., who was a 14 year-old minor at the time (PSAMF at ¶ 2), and 12 calls in 2 hours to Nick Kukuc (PSAMF at ¶¶ 3, 11),

4) up to 30 calls in one 1 day, and more than 10 calls on numerous days (PSAMF at ¶ 3),

5) more than one hundred (100) hang up calls, without meaningfully identifying itself (PSAMF at ¶ 4),

6) the use of robotic telephone calls to Plaintiffs' cellular phones with an automatic telephone dialing system, without consent (PSAMF at ¶ 1),

7) all in pursuit of a disputed $420.54,

8) which were aggravating, harassing, and bullying, interfering with Messina's day, and job, affecting her health, causing migraines, constant headaches, constant depression, crying, fear of losing her job, sleeplessness, panic

---

[31] Def.'s MSJ at p.16. *Mlynek v. Household Fin. Corp.,* 2000 WL 1310666 (N.D. IL Sept. 13, 2000); *Lewis v. Physicians & Dentists Credit Bureau,* 27 Wash. 2d 267, 273 177 P.2d 896, 899 (1947).

[32] Def.'s MSJ at 15-6.; *Huskey v. Nat'l Broad Co., Inc.,* 632 F.Supp. 1282 (N.D. Ill. 1986); *Cox Broad Corp. v. Cohn,* 95 S. Ct. 1029 (1974); *Browning v. AT&T Corp.,* 682 F.Supp.2d 832 (N.D. Ill. 2009); *Vega v. Chicago Park Dist.,* 958 F.Supp.2d 943 (N.D. Ill. 2013); and *Acuff v. IBP, Inc.,* 77 F.Supp.2d 914 (C.D. Ill. 1999).

[33] *Quinlan v. CitiMortgage, Inc.* 2012 WL 2401380, 6 (E.D. Cal. 2012); *Joseph v. J.J. Mac Intyre, Cos., LLC,* 281 F. Supp. 2d 1156, 1165 (N.D. Cal. 2003); *Majeski v. I.C. Sys.,* 2010 WL 145861 (N.D. Ill. Jan. 8, 2010) ("the reasonableness of the volume and pattern of telephone calls is a question of fact best left to a jury."); *Schumacher v. Credit Protection Ass'n,* 2015 WL 5786139 (S.D. Ind. 2015) (jury question whether 54 calls to a cell phone had the natural consequence to harass, oppress or abuse).

attacks, resulting in a need for prescription medication (Zopidem and Clonazepam) and over the counter medication (Excedrin and Advil) (PSAMF at ¶ 39); caused Kukuc stress, family dysfunction, and distraction ((PSAMF at ¶ 40); and caused A.M. to feel highly aggravated, annoyed, and upset (PSAMF at ¶ 41)

intruded upon Plaintiffs' seclusion.

At best Green Tree can dispute Ms. Messina's characterization of the conversations it had with her.[34] Green Tree produced audio recordings of some of its calls with Plaintiffs. Notably, a document is authenticated when produced by a party in discovery.[35] The recordings were then transcribed by a certified court reporter.[36] Ms. Messina authenticated the recordings and corresponding transcripts.[37] Green Tree also testified the written transcripts matched the audio recording played at its deposition, and was even able to identify the voice of its collector in several of the recordings.[38] However, the weighing of this evidence and fact questions is for the jury.

### B. It is a Jury Question Whether Green Tree Proved it Had Prior Express Consent Under the TCPA

- Whether there was consent in a TCPA case is a question of fact for a jury.[39]

- "The scope of a consumer's consent depends on its context and the purpose for which it is given. Consent for one purpose does not equate to consent for all purposes."[40]

- Where a customer provided a phone number in conjunction with cancelling service, he did not provide consent to receive calls about a debt balance that accumulated.[41]

---

[34] *Lennon v. Christoph,* 1997 WL 57150 (N.D. IL Feb. 4, 1997) (nor would the sham affidavit rule apply here since it does not apply to inconsistent testimony in the same deposition; and a witness can refresh her recollection to aid her in subsequent testimony).

[35] *U.S. v. Lawrence*, 934 F.2d 868 (7th Cir. 1991), *South Central Bank v. Citicorp Credit Services*, 863 F. Supp. 635 (N.D. Ill. 1994).

[36] Sartell Dec., at ¶ 22; Sartell Dec., **Exhibit 7**.

[37] Messina Dec. at ¶ 5.

[38] Sartell Dec., **Exhibit 11** at 150:22-11; 155:23-156:20; 157:15-158:20; 160:9-162:23; 164:8-165:14; 169:5-174:22.

[39] *Whatley v. Creditwatch Services, Ltd.*, 2012 WL 2885640 (E.D. TX 2012).

[40] *Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727 (N.D. IL 2014); *Kolinek v. Walgreen Co.*, 2014 WL 3056813 (N.D. IL July 7, 2014).

[41] *Nigro v. Mercantile Adjustment Bureau, LLC,* 769 F.3d 804, 805 (2d Cir. 2014).

      1.    *Green Tree Fails Its Burden to Show it Had Prior Express Consent to Call Messina*

Green Tree's motion regarding Messina's TCPA claim is limited to the argument it had prior express consent to call her. Thus, Plaintiff will respond to that limited argument. Prior express consent is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof.[42] Courts in Illinois, and elsewhere, have ruled a consumer can revoke consent under the TCPA orally or in writing.[43] The Third Circuit Court and Eleventh Circuit Courts of Appeal have both reversed trial courts that found a consumer could not orally revoke consent under the TCPA.[44] The FCC has agreed with these decisions.[45] Similarly, trial courts have held, "oral revocation of consent is legally effective under the TCPA, even in the debt-collection context."[46] There is no magic language necessary to revoke consent.[47] Indeed, the statute is silent as to whether any specific language is required. A rigid requirement would not make sense given the statute's remedial nature and its purpose to protect the public. Because the TCPA is a remedial statute, it should be construed to benefit consumers.[48]

As noted above, Ms. Messina effectively revoked any consent for Green Tree to call her cell

---

[42] *See Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 (9th Cir. Cal. 2011); *Reyes v. Saxon Mortgage,* 2009 WL 3738177 (S.D. Cal. 2009); *Sengenberger v. Credit Control Services, Inc.,* 2010 WL 1791270 (N.D. IL 2010); *Hicks v. Client Services, Inc.,* 2009 WL 2365637 (S.D. FL 2009).

[43] *Gutierrez v. Barclays Group,* 2011 WL 579238 (S.D. Cal. 2011); *see also Beal v. Wyndham Vacation Resorts,* 956 F.Supp.2d 962 (W.D. WI 2013).

[44] *Gager, v. Dell Financial Services, LLC,* 727 F.3d 265, 274 (3rd Cir. 2011); *Osorio v. State Farm Bank, FSB,* 746 F.3d 1242 (11th Cir. 2014).

[45] In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC 15-72, p. 36, ¶64, first line ("Consumers have a right to revoke consent, using any reasonable method including orally or in writing."), and p.33, ¶¶ 55-6; *see also* https://www.fcc.gov/document/tcpa-omnibus-declaratory-ruling-and-order

[46] *Adamcik v. Credit Control Servs.*, 832 F. Supp. 2d 744, 753 (W.D. Tex. 2011); *see Beal,* 956 F. Supp. 2d at 977; *Osorio,* 746 F.3d at 1255.

[47] *See Gager v. Dell Financial Services, LLC,* 727 F.3d 265 (3rd Cir. 2011).

[48] *Id.* at 271.

phone. On numerous occasions, Messina told Green Tree to stop calling, including May 24, 2013,[49] July 19, 2013,[50] August 29, 2013, and November 19, 2013.[51] (PSAMF at ¶¶ 5, 8, 16.) And, at times Green Tree acknowledged her claims of harassment and agreed it would stop calling, such as on August 29 and November 15, 2013. (PSAMF at ¶¶ 8, 16.) Green Tree produced documents showing the dates and times of calls placed by its Aspect autodialer.[52] Green Tree testified there were 57 autodialed calls placed by the dialer, which appear on a document, which spans from May 24, 2013 to November 19, 2013.[53] If we subtract the 4 calls placed between May 24 and August 29, 2013, then Green Tree placed fifty-53 outbound dialer calls between August 30 and November 19, 2013. Thus, while Green Tree contends no dialer calls were placed to Messina between July 19, 2013 and August 26, 2013 (Def.'s SUMF at ¶ 60), Green Tree fails to reveal there were 53 autodialer calls placed between August 30 and November 19, 2013. Green Tree has failed to meet its burden to show express consent to place these 53 autodialer calls to Messina's cell phone.

After repeatedly telling Green Tree she felt harassed, Messina provided limited consent for the research team to investigate the $420.54 dispute, and for *it* to call her back. Messina's consent for that limited one purpose does not equate to consent to call her repeatedly in an attempt to collect a debt. (PSAMF at ¶ 8). Especially, when she provided instructions to the contrary, as on August 26, 2013, "**stop calling and asking for money**." *Id.* Courts in this District have held, "The scope of a consumer's consent depends on its context and the purpose for which it is given.

---

[49] Messina Dec. at ¶ 11; Sartell Dec., **Exhibit 8** at GT_041 ("H/O is mad that we are calling becuz (*sic*) she has spoken with us n (*sic*) feels that we are harassing her..she expresses fraustrations (*sic*) n (*sic*) sd (*sic*) will call her lawyer..").
[50] Messina Dec. at ¶ 12; *see also* Def.'s SUMF at ¶ 59; Sartell Dec., **Exhibit 8** at GT_039.
[51] *See also* Def.'s SUMF at ¶ 62.
[52] Sartell Dec., **Exhibit 10**; for foundation, *see* Sartell Dec., **Exhibit 12** at 11:10-21.
[53] Sartell Dec., **Exhibit 10**, for foundation, *see* Sartell Dec., **Exhibit 12** at 29:14-18.

Consent for one purpose does not equate to consent for all purposes."[54]  Indeed, where a customer provided a phone number in conjunction with cancelling service, he did not provide consent to receive calls about a debt balance that accumulated.[55] At the very least, it is a question for the jury.

2.  *It is a Fact Question Whether Green Tree Called Messina's Children, Kukuc and A.M., with an Autodialer*

Green Tree's motion regarding the children's TCPA claims is limited to the argument it did not use an autodialer to place those specific calls.  Thus, Plaintiffs will respond to that limited argument.  A recent decision from this District denied summary judgment to Green Tree on the very issue of whether its point and click method, is indeed an "automated telephone dialing system" as defined by the TCPA.[56]  In the point and click system a debt collector clicks on a phone number on a computer screen, which then automatically dials a number that was stored on the Server.[57] Green Tree produced a system generated list of the calls made to Messina's children via this point and click method.[58]

Green Tree testified a collection agent can log into its predictive autodialer from the UCSe application.[59] It also testified a collection agent can dial a phone number through the UCSe application, via the point and click method, by opening up a pop up window that that has the eligible phone numbers on an account. They would select the phone number, and then click on a box that says, "dial."[60] Green Tree argues that logging on uses the predictive dialer, not logging on does not.  However, both systems have the capacity to work with the dialer. The bottom line is the systems are all interconnected, and have the capacity to work with the dialer, and as this court held,

---

[54] *Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727 (N.D. Ill. 2014); *Kolinek v. Walgreen Co.*, 2014 WL 3056813 (N.D. Ill. July 7, 2014).
[55] *Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 805 (2d Cir. 2014).
[56] *Robinson v. Green Tree Servicing, LLC*, 2015 WL 4038485 (N.D. Ill. 2015).
[57] Def.'s SUMF at ¶ 39.
[58] *See* Sartell Dec., **Exhibits 8, 10**.
[59] Sartell Dec., **Exhibit 11** at 35:20-37:10.
[60] Sartell Dec., **Exhibit 11** at 42:04-46:17.

"There is a genuine issue of material fact with respect to whether any calls were made using equipment which had the requisite capacity to act as an ATDS as defined by the TCPA." The court noted, "Because the server for the UCSe interface has the capacity of working with the Dialer, Plaintiff argues that the use of the server, even without logging onto the Dialer, is considered an ATDS."[61] Citing the Ninth Circuit Court of Appeals, this court observed that the current state of the law is that "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the *capacity* to do it."[62]  In rejecting the same argument Green Tree makes herein, this court held, "There is a genuine issue of material fact with respect to whether any calls were made using equipment which had the requisite capacity to act as an ATDS as defined by the TCPA."  Then, shortly after the *Robinson* decision, the FCC issued an order consist with this court's holding, stating:

> We agree with commenters who argue that the TCPA's use of "capacity" does not exempt equipment that lacks the "present ability" to dial randomly or sequentially. We agree that Congress intended a broad definition of autodialer, and that the Commission has already twice addressed the issue in 2003 and 2008, stating that autodialers need only have the "capacity" to dial random and sequential numbers, rather than the "present ability" to do so. Hence, any equipment that has the requisite "capacity" is an autodialer and is therefore subject to the TCPA.[63]

Other courts within the Seventh Circuit confronted with the preview dialing/point and click issue have stated that arguing such a system is not an "automated telephone dialing system" under the TCPA is perilously close to violating Fed. R. Civ. P. 11.[64]  Similarly, Green Tree basically asks this Court to ignore the recent FCC Order which specifically refused to adopt a standard that

---

[61] *Robinson v. Green Tree Servicing, LLC*, 2015 WL 4038485 (N.D. IL 2015).
[62] *Satterfield v. Simon & Schuster. Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (emphasis added).
[63] In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC 15-72 (July 10, 2015).
[64] *Nelson v. Santander Consumer USA, Inc.*, 931 F. Supp. 2d 919, 928-930 (W.D. Wis. 2013) (vacated after settlement).

required human intervention to determine if a call was placed with an autodialer.[65] The FCC also stated, "Congress intended a broad definition of autodialer…the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities."[66] The FCC ruling was issued well after the *Modica* decision relied on by Green Tree; and thus *Modica* is no longer reliable. Furthermore, the FCC Order is not reviewable by trial courts due to the Hobbs Act.[67] Thus, the MSJ must be denied.

### C. Green Tree is a "Debt Collector" for Purposes of the FDCPA

Green Tree is a debt collector because first, Messina's mortgage Note, the agreement creating the debt at issue, defined "default" as being just one day late, and second, because Green Tree unequivocally treated Messina's account as if it were in default from the moment it began servicing it. Indeed, why else would its collectors have placed at least 265 calls asking for payment? (PSAMF at ¶ 1.) Moreover, the plain language of Messina's Note, the relevant Fannie Mae servicing guidelines, and the records of both Bank of America and Green Tree point to the conclusion that Messina was in default while her loan was being serviced by Bank of America and *before* Green Tree obtained Messina's account. Thus, Green Tree's reliance upon a single statement of fact, namely, that Bank of America had not declared Messina in default before it transferred servicing to Green Tree, in support of its argument that it is not a "debt collector," is unavailing. And, at the very least, a disputed issue of material fact exists as to whether Messina's account was in default before Green Tree began servicing it. Summary judgment must be denied.

---

[65] In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC 15-72, at ¶ 20 (July 10, 2015).

[66] *Id.* at ¶¶ 15-6.

[67] *See Leckler v. Cashcall, Inc.,* 2008 WL 5000528 (N.D. Cal. 2008).

The FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee and as creditors if it was not."[68] "Creditors" are not covered by the FDCPA. A "debt collector" under the FDCPA acquires accounts already in default or otherwise treats accounts it acquires as though they were in default at the time it acquired it.[69] A mortgage servicer may be liable under the FDCPA for conduct undertaken pursuant to a *mistaken* belief that an account was in default before acquisition.[70] The FDCPA does not define "default," but the Seventh Circuit has looked with approval upon cases that hold that the default terms of the debt transaction itself should control.[71] And, courts within the Seventh Circuit have found a debtor in "default" when a payment was missed pursuant to terms of contract with creditor.[72] Also, in another recent case involving Green Tree it was noted, "to determine a default, it appears that courts generally look to the terms of the agreement."[73] While the agreement was not available in that case, numerous other courts have denied summary judgment when the agreement defines "default."

 1. *Default Conditions in Messina's Note and Her Payment History Show She Was In Default Prior to Bank of America's Servicing Transfer to Green Tree*

Pursuant to the default terms of Messina's mortgage Note, payments not received in full *on the date due* cause a default. (PSAMF at ¶ 21.) The date due is the first of each month. (PSAMF at ¶

---

[68] *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) (citing 15 U.S.C. § 1692a(6)(F)(iii)).

[69] *Schlosser*, 323 F.3d at 539; *see also Bridge v. Ocwen Federal Bank, FSB, et al.* 681 F.3d 355, 362 (6th Cir. 2012) (holding that "the definition of debt collector pursuant to § 1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default or has treated the debt as if it were in default at the time of acquisition [irrespective of] whether such treatment was due to a clerical mistake, other error, or intention."). *See also, Geary v. Green Tree Servicing, LLC*, 2015 WL 1286347 (S.D. Ohio Mar. 20, 2015).

[70] *See generally, Schlosser, supra.*

[71] *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 502 n. 2 (2008) (citing *Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003)).

[72] *See Ananthapadmanabhan, et al. v. BSI Fin. Servs., Inc.*, Case No. 1:15-cv-5412 (N.D. Ill. December 15, 2015) (citing Fed. Trade Comm'n, Advisory Op. n.2 (April 25, 1989) ("Whether a debt is in default is generally controlled by the terms of the contract creating the indebtedness and applicable state law."); *Hartman v. Meridian Fin'l Services, Inc.*, 191 F. Supp. 2d 1031,1043-4 (W.D. Wis. 2002).

[73] *Langley v. Green Tree Servicing, LLC*, 2015 WL 6965274 (S.D. Tex. Nov. 10, 2015)

19). Like many people, Messina was in the habit of paying her mortgage during the 15-day "grace period" that followed the due date, thus avoiding a late fee, when she could. (PSAMF at ¶ 20; *see also* Def.'s SUMF at ¶ 12.) During 2012 and 2013, Messina *never* paid her mortgage on or before the due date and she often paid after the 15-day grace period, incurring late fees. (PSAMF at ¶ 20.) Thus, according to her mortgage Note, Messina was in default each month because she paid her mortgage after the due date, which was the first of the month. When, in the early part of 2013, Bank of America required Messina to pay amounts for escrow, Messina mistakenly did not pay those amounts. (PSAMF at ¶¶ 22-4.) The combination of Messina's short payments and Bank of America's imposition of escrow items on her account resulted in Messina's March 19, 2013 payment being applied to a February 1, 2013 balance. (PSAMF at ¶ 24.) In fact, Green Tree applied Messina's April 16, 2013 payment, the first she made to Green Tree, to amounts that were due and owing on March 1, 2013. (PSAMF at ¶¶ 30.) Therefore, Messina was at least six weeks behind on her mortgage by the time Bank of America transferred servicing to Green Tree on April 1, 2013. (PSAMF at ¶ 28.) This fact, coupled with the clear language of Note, makes it clear that Green Tree acquired an account in default from Bank of America and is a debt collector under the FDCPA.

2.     *Green Tree's Treatment of Messina Account Shows It Treated the Messina Account as Though It Was In Default Prior To Acquiring Servicing*

Like the mortgage servicer in *Schlosser*, from the very moment it began servicing the Messina account, Green Tree's conduct indicates that it believed that the loan was in default. Only in hindsight does it seek to avoid being defined as a "debt collector" under the FDCPA. One of the first actions Green Tree took after it received the servicing of the Messina account was to order an inspection of the Messina property. (PSAMF at ¶ 27.) Fannie Mae guidelines require such an inspection on accounts that are *more than 45 days delinquent*. (PSAMF ¶ 26.) Fannie Mae guidelines make no substantive distinction between the word "delinquent" and the word "default," defining "default" as "[t]he failure to make a mortgage payment or to otherwise comply with one or more

covenants of the mortgage."[74] The first statement Green Tree sent to Messina, dated May 10, 2013, indicated that three months' worth of payments were due on June 1, 2013. (PSAMF at ¶ 31.) The three months were April, May, and June. That is, April's payment had not been applied to the account, May's payment was outstanding because it was after May 1, and June's payment would come due on June 1. Green Tree later accepted Messina's payment of May 16 and applied it to amounts due April 1, 2013. (PSAMF at ¶ 32.)

3.  *Seventh Circuit Law Declares Green Tree a Debt Collector*

The *Schlosser* interpretation provides the broadest protections for consumers because it rejects a bright line construction of the rule regarding whether a mortgage servicer is a creditor or a debt collector. The Seven Circuit observed that:

> [I]f the parties to the assignment are mistaken about the true status, that status will not determine the nature of the activities directed at the consumer. It makes little sense, in terms of the conduct sought to be regulated, to exempt an assignee from the application of the FDCPA based on a status it is unaware of and that is contrary to its assertions to the debtor. The assignee would have little incentive to acquire accurate information about the status of the loan because, in the context of the mistake in this case, *its ignorance leaves it free from the statute's requirements.*[75]

Green Tree's interpretation of the 1692a(6)(F)(iii) exception would create a self-serving loophole that would allow it to avoid the requirements of the FDCPA based purely upon a prior servicer's arbitrary determination of whether a loan was in default. Such an outcome should be avoided and other courts have followed this line.[76] Summary judgment for Green Tree should be denied.

---

[74] Sartell Dec., **Exhibit 18** at 1200-10.

[75] *Schlosser*, 323 F.3d at 538 (emphasis added).

[76] *Geary v. Green Tree Servicing, LLC*, 2015 WL 1286347 (S.D. Ohio Mar. 20, 2015)("allowing parties potentially qualifying as debt collectors to unilaterally define 'default' as used in the FDCPA would frustrate the intent of the statute."), citing *Justice v. Ocwen Loan Servicing, LLC*, No. 2:13CV00165, 2014 WL 526143, at *5 (S.D. Ohio Feb. 7, 2014).

17

### D. The Evidence Shows That Green Tree violated the Illinois Consumer Fraud and Deceptive Business Practice Act

Green Tree argues that it is entitled to summary judgment because its representations to Messina regarding her escrow account were neither deceptive nor unfair. Even if true, Messina's ICFA claim still survives as the evidence shows that Green Tree acted unfairly under the Act by: (1) repeatedly calling her without her consent; and (2) unfairly charging her $12.00 to make mortgage payments by phone as it would not let her make payments online because she was in default (the very same fee criticized in the FTC's $63 million settlement agreement with Green Tree). As such, Green Tree's motion must be denied.

1. *Green Tree's Repeated and Unwanted Telephone Calls Constitute Unfair Acts Under the ICFA*

It has long been established that unfair conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act.[77] In determining whether a practice is unfair under the ICFA, courts are to consider:

(1)  whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness;

(2)  whether it is immoral, unethical, oppressive, or unscrupulous;

(3)  whether it causes substantial injury to consumers[.][78]

Moreover, "all three of [these] criteria . . . do *not* need to be satisfied to support a finding of unfairness."[79] Instead, " '[a] practice may be unfair because of the degree to which it meets one of

---

[77] *Elder v. Coronet Ins. Co.*, 201 Ill. App. 3d 733 (1st Dist. 1990); *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417-18 (2002).
[78] *FTC v. Sperry & Hutchinson*, 405 U.S. 233, 244-45 n. 5 (1972); *Robinson*, 201 Ill. 2d at 417-18.
[79] *Robinson*, 201 Ill. 2d at 418 (emphasis added).

the criteria or because to a lesser extent it meets all three.' ''[80]  As the evidence has shown that Green Tree has acted unfairly under the ICFA, its motion for summary judgment must be denied.

      a.      Green Tree's repeated calls to Messina without her consent violate public policy.

Green Tree's unrelenting calls to her cell phone number, without her consent and despite her requests that it stop, violates public policy as established by the TCPA, and constitutes unfair conduct under the ICFA.[81]  A practice offends public policy "if it violates a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations."[82]

      b.      Green Tree's conduct was unscrupulous, oppressive, unethical, and unfair.

Green Tree's conduct was nothing short of oppressive, unscrupulous and unfair, in that it would continue to call, even after Ms. Messina told Green Tree that such calls were causing her aggravation and stress, causing her to lose sleep, and were going to cause her to be fired from her job (PSAMF at ¶ 8), and harassing her children in attempt to collect the debt (PSAMF at ¶ 15.).

      c.      Green tree's illegal actions caused Plaintiff substantial injury.

As a result of Green Tree's conduct, Messina suffered substantial injury in the form of aggravation and stress, which caused her migraines, anxiety, panic attacks, chest pains, loss of appetite, sleepless nights and made her fear that she was going to lose her job.  In addition, as a result of Green Tree's conduct, she went to the doctor and had to pay out-of-pocket costs in the form of co-pays for medications, such Zolpidem, and Clonazepam, Advil, and Excedrin. (PSAMF at ¶ 39.)

---

[80] *Id.* (*quoting Cheshire Mortgage Services, Inc. v. Montes*, 612 A.2d 1130 (Conn. 1992)).

[81] *Centerline Equip. Corp. v. Banner Pers. Serv.*, 545 F. Supp. 2d 768, 779-780 (N.D. Ill. 2008) (violation of TCPA's prohibition on unlawful faxes can serve as basis for unfairness prong of the ICFA).

[82] *W. Ry. Devices Corp. v. Lusida Rubber Prods.*, No. 06-C0052, 2006 WL 1697119, at *4 (N.D. Ill. June 13, 2006).

2.  *Green Tree Acted Unfairly Under the ICFA By Requiring Messina To Pay A Convenience Fee In Order Make A Mortgage Payment*

a.  Green Tree's telephone payment fee violates public policy

Green Tree told Ms. Messina that because she was on default, she could only make such payments over the phone and be subject to a $12.00 service fee. (PSAMF at ¶ 42.) However, under the Fair Debt Collection Practices Act, "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." As the $12.00 was not part of the actual debt to Green Tree, its incidental collection thereof violates the FDCPA.[83]

As such conduct was in violation of the FDCPA, its collection of the payment was done in violation of the public policy of this State.

b.  Green Tree's collection of the $12.00 telephone payment fee was unscrupulous, unethical, and unfair

Unlike other consumers that could make a free payment online, Green Tree singled out Ms. Messina, and a number of other consumers, by refusing to allow her this method of payment, and instead unfairly charging her $12.00 to make a payment via telephone when Green Tree was not allowed to impose such a fee in the first place. Repeatedly charging her this fee was especially unscrupulous, unfair and unethical, causing substantial emotional and economic injury.

---

[83] *See Acosta v. Credit Bureau*, 2015 WL 1943244 (N.D. Ill. 2015) (finding plaintiff stated a claim under the FDCPA where defendant charged a $14.95 processing fee for paying the debt via credit card); *Campbell v. MBI Assocs., Inc.*, 98 F. Supp. 2d 568 (E.D.N.Y. 2015) (granting plaintiff's motion for summary judgment under the FDCPA where the defendant's collection letter said it would charge a $5.00 fee for paying the debt via credit card); *Weast v. Rockport Fin., LLC*, No. 4:15CV00336, 2015 WL 4427281 (E.D. Mo. July 17, 2015) (denying defendant's motion to dismiss where plaintiff alleged that defendant would charge a $3.00 convenience for paying the debt via credit card); *Shami v. Nat'l Enter. Sys.*, No. 09-CV-722 (RRM) (VVP), 914 F.Supp.2d 353 (E.D.N.Y. Sep. 23, 2010) (holding that defendant's charging of transaction fees for payments by phone or internet were fees "incidental to plaintiff's purported actual debt" prohibited by § 1692f(1)).

### E. The Motion for Summary Judgment Must Be Denied as to Messina's RESPA Claim

Summary judgment for Green Tree concerning Messina's RESPA claim should be denied because there is a genuine dispute over whether Green Tree was entitled to ignore her January 16, 2014 Notice of Error simply because it was mailed to an address other than that designated for "Qualified Written Requests." Messina did not send Green Tree a "Qualified Written Request," but rather, pursuant to newly effective amendments to Regulation X, RESPA's implementing regulations, Messina sent Green Tree a "Notice of Error." (PSAMF at ¶ 33; *see* Sartell Dec., **Exhibit 21**.) Green Tree's documents, sent to Messina before the newly updated Regulation X requirements took effect on January 10, 2014, did not address Notices of Error.[84]

Green Tree responded to Messina's attorneys *from Green Tree's designated address* on or about February 7, 2014, stating that it would investigate and respond to her inquiry within "sixty (60) business days[85] from the date we received your correspondence." (PSAMF at ¶ 34; *see* Sartell Dec., **Exhibit 22**). Green Tree clearly believed that its correspondence with Messina and her attorneys was governed by RESPA. Green Tree later confirmed this in a letter dated March 11, 2014, in which it inaccurately characterized Messina's Notice of Error as a Qualified Written Request, despite the new regulations having been in effect for nearly three months. In the same letter, Green Tree also requested that Messina's attorneys provide proof of Messina's authorization to release information about her mortgage account to them. (PSAMF at ¶ 38; *see* Sartell Dec., **Exhibit 23**.) However,

---

[84] Responsibility for RESPA regulations shifted from Department of Housing and Urban Development to the Consumer Financial Protection Bureau with the passage of the Dodd-Frank Financial Reform and Consumer Protection Act of 2010. Thus, the amended RESPA regulations are found in Chapter 12 of the Code of Federal Regulations, which governs banks and banking, and no longer in Chapter 24, which governs housing and urban development. The current RESPA regulations, found at 12 C.F.R. § 1024, took effect January 10, 2014. The old regulations, cited in Defendant's Motion for Summary Judgment, are found at 24 C.F.R. 3500.

[85] The 60-day timeframe referenced in the letter reflects the pre-Dodd-Frank amendment requirements of 24 C.F.R. § 3500.21(e)(3), RESPA's old regulations.

Green Tree had *already* been sending information about Messina's mortgage account, all monthly statements and other correspondence, to her attorneys *for more than a month*. (PSAMF at ¶ 36.)

Messina's attorneys forwarded her authorization to Green Tree at the designated address on August 25, 2014 and it was received by Green Tree on August 28, 2014. (PSAMF at ¶ 38; *see* Sartell Dec., **Exhibit 24**.) Because "[a] servicer may request supporting documentation from a borrower in connection with the investigation of an asserted error, *but may not . . . [r]equire a borrower to provide such information as a condition of investigating an asserted error*[,]"[86] Green Tree was not entitled to simply ignore Messina's Notice of Error. A genuine issue of fact exists as to whether Green Tree ever investigated Messina's asserted error. Moreover, after receiving the authorization,[87] Green Tree was required to address the substance of the Notice of Error and had to take certain corrective or information actions.[88] It never did.

The facts demonstrate that Green Tree misapplied the then-applicable regulations pertaining to Messina's Notice of Error and simply ignored it, needlessly prolonging the resolution of her dispute with Green Tree. Had Green Tree properly investigated Messina's Notice of Error and corrected the $420.54 issue, things would have looked very different. It should be left up to the jury to decide what responsibilities Green Tree had in light of the facts of this case.

---

[86] 12 C.F.R. § 1024.35(e)(2)(i) (emphasis added).
[87] The Official Bureau Interpretations to Regulation X, included in Supplement I to 12 C.F.R. § 1024 note that "A servicer may undertake reasonable procedures to determine if a person that claims to be an agent of a borrower has authority from the borrower to act on the borrower's behalf, for example, by requiring that a person that claims to be an agent of the borrower provide documentation from the borrower stating that the purported agent is acting on the borrower's behalf. *Upon receipt of such documentation, the servicer shall treat the notice of error as having been submitted by the borrower.*"
[88] *See* 12 C.F.R. § 1024.35(e)(1).

IV.    <u>**CONCLUSION**</u>

For the reasons stated above, Plaintiffs respectfully request that this Court deny Green Tree's Motion for Summary Judgement in its entirety.

DATED:        December 28, 2015               Respectfully submitted,

By: <u>*/s/ Jordan M. Sartell*</u>
      One of Plaintiffs' Attorneys

      ZAMPARO LAW GROUP, P.C.
      Roger Zamparo, Jr.
      Jordan M. Sartell
      2300 Barrington Road, Suite 140
      Hoffman Estates, IL 60169
      (224) 875-3202 (t)
      roger@zamparolaw.com
      jordan@zamparolaw.com

23

## <u>CERTIFICATE OF SERVICE</u>

Jordan M. Sartell, an attorney, certifies that on December 28, 2015, he electronically filed the foregoing **Plaintiffs' Opposition to Defendant's Motion for Summary Judgment** with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to the following:

Anna-Katrina S. Christakis, Esq.
Jennifer Majewski, Esq.
Pilgrim Christakis LLP
321 N. Clark St., 26th Floor
Chicago, Illinois 60654
Ph. (312) 939-0953
Fax (312) 939-0983

<em>/s/ Jordan M. Sartell</em>